J-A10029-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.S., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2962 EDA 2023 |

Appeal from the Decree Entered November 27, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s): CP-51-AP-0000336-2023

BEFORE: PANELLA, P.J.E., BECK, J., and COLINS, J.[*]

MEMORANDUM BY BECK, J.: **FILED MAY 17, 2024**

J.R. ("Mother") appeals from the decree terminating her parental rights to D.L.S., Jr. ("Child") entered by the Philadelphia County Court of Common Pleas (the "trial court").[1] Finding that the trial court's termination decision is supported by clear and convincing evidence, we affirm.[2]

The record reflects that the hearing court held a combined hearing to determine Child's permanency goal pursuant to 42 Pa.C.S. § 6351(f) and to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court further entered an order on November 27, 2023, changing Child's dependency permanency goal from reunification to adoption. Mother does not challenge that order on appeal.

[2] The trial court also issued a decree terminating the parental rights of D.S. ("Father") the same day. Father's appeal is separately pending before this Court.

rule upon the petitions filed by the Philadelphia County Department of Human Services ("DHS") to terminate the parental rights of Mother and Father to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). Mother attended the hearing, although she arrived late and then left the proceedings shortly thereafter because she became upset by the testimony provided by the visitation supervisor about Child's behavior during Father's visits, reentering later in the proceedings. *See* N.T., 11/27/2023, at 26, 36, 69. Father was not present, despite receiving notice of the hearing, but was represented by counsel.

The trial court summarized the testimony provided related to Mother, which our review of the record confirms, as follows:

> Jasmine Brown testified that she is a visitation coach for CUA and that she has supervised many visits between the parents and the child. … She testified that during the visits Mother often has difficulty keeping the child inside of the visitation room and from preventing him from climbing on things or throwing toys. Ms. Brown stated that she frequently has to direct Mother to attempt to control the child during the visits.

> Ms. Brown noted that during the visits Mother appeared uncertain of the child's actual name. She testified that Mother said, "what's his name?" and then articulated similar sounding names as though she was guessing what her son's true name was. Ironically, when Mother identified herself at the hearing and stated her relation to the case, she identified the Child, her son, by an incorrect name. Ms. Brown testified that the Child calls Mother by her first name and sometimes "mommy."

> Ms. Brown testified that Mother has expressed concern that she is unable to parent the Child in his current state and that she often gets frustrated when the Child is upset. Mother informed Ms. Brown that she does not want the Child returned to her until he is older because he will be better behaved then. Mother has

also told Ms. Brown that she does not have a bond with the child because he is not well behaved and does not listen to her. Mother believed that "when [the child] gets older he can listen better then [she] can probably take care of it." Ms. Brown testified to the wavering of Mother's intentions concerning parenting the Child. Mother would often say that she could not parent the Child on her own and that she believed it was best for the Child to stay with the resource parent. Mother would then say that she wanted full custody.

Ms. Brown testified regarding a concerning incident of the Child choking while being fed by Mother during a supervised visit. She stated that Mother fed the Child a heaping serving of oatmeal that was too substantial for the Child to eat. This resulted in the child choking when he tried to swallow it. Mother panicked when this happened, and the Child fell off her lap. Ms. Brown picked the child up and performed the Heimlich maneuver which cleared the child's airway. As this was happening Mother became hysterical.

Ms. Brown noticed that Mother seems to have an extraordinarily difficult time reading even simple texts. She witnessed Mother attempting to read the Child a children's book but stated that she struggled to read and often asked her what certain words were. Mother accompanied the Child on a trip to Sesame Place with CUA but did not parent the Child appropriately. CUA noted that Mother frequently tried to pass the Child off to CUA workers so that Mother could enjoy the amusement park on her own. Mother did not push the Child in a stroller during the trip and depended on CUA to do so.

Ms. Brown testified that she has been involved in this case for approximately ten months. She stated that Mother has not made any progress in terms of being able to implement any parenting skills. She noted that Mother seems to always be looking for other people to take care of the Child for her or with her. She also observed that Mother is aware that she is unable to parent the child on her own.

Dr. Elizabeth Johnson has a doctorate in clinical psychology and is employed as a therapist and performs forensic evaluations. She testified as an expert witness in this area during the hearing. She stated that she completed a Parenting Capacity Evaluation (PCE) for Mother. The PCE consisted of reviewing records, interviewing Mother, and having Mother submit to psychological

testing. Dr. Johnson testified that she reviewed mental health records from Mother's current provider. She also reviewed visitation notes from CUA and had a conversation with her current CUA worker. Mother also completed the Child Abuse Potential Inventory, the Parenting Stress Index, and the Personality Assessment Inventory (PAI) assessments. The purpose of the PAI is to help gain an understanding of whether the person being examined meets the criteria for a mental health diagnosis. Mother completed this assessment, but the results were not valid for interpretation as they showed elevated inconsistencies. Dr. Johnson stated that an elevated inconsistency scale such as this is often the result of the person submitting to the test not paying attention or having reading comprehension difficulties. The results of the Child Abuse Potential Inventory assessment were also invalid. Dr. Johnson opined that this was due to Mother trying to present herself in an overly positive light. Mother's results on the Parent Stress Index showed that she scored high for inattention. Dr. Johnson said that this indicates that Mother perceives the Child as inattentive, hyperactive and someone who does not listen to her. Dr. Johnson noted in the PCE that Mother "may lack energy to keep up with the child's energy level or have unrealistic expectations from mature adult like behaviors."

Dr. Johnson believes that the services extended by DHS have had no effect on Mother's ability to parent. She noted in her report that Mother "exhibits behaviors that suggest her ability to effectively parent her son independently remain limited. And services rendered thus far may have had minimal impact. Although DHS was originally involved primarily due to concerns of her ability to physically care for [the Child] and provide a safe, sanitary home environment additional area of concern are present. These include employment, partner selection, violence, and general parenting skills, all of which are significantly influenced by her mental health."

Dr. Johnson observed that Mother does not want to discipline the Child. Mother specifically shared that with her during their interview. Mother prefers that someone other than her discipline the Child when necessary. This concerned Dr. Johnson who also noted that one of Mother's primary coping mechanisms is to leave, rather than address an issue. This causes concerns regarding safety, supervision, and neglect. Mother also has a normalization of violence in relationships as a result of her

past experiences. Dr. Johnson believes that Mother requires therapy with a specific focus on emotional regulation skills.

Whitney Crawford testified that she is a case manager for CUA and that she was assigned this case. She testified that Child has always lived with the resource parent and at no time has the Child resided with Mother or Father. She stated that the Child currently receives speech therapy, occupational therapy, behavioral therapy, and physical therapy. She noted that she has seen the Child in the presence of the resource parent and that sometimes the Child calls the resource parent "mom" and other times by her first name.

\* \* \*

Mother has a history of conflict with others in employment and therapeutic settings. Mother recently began working at McDonald's after leaving a job at FedEx because she was not getting along with other people there. Ms. Crawford also testified Mother was discharged from Family School because she was not able to get along with staff members. Mother was re-referred to Family School later and was only able to attend two sessions because she continued to have issues with staff. Mother's most recent assessment was that she was only minimally compliant with her SCP objectives. Ms. Crawford stated that she does not believe that the Child would be irreparably harmed if the parental rights of Mother were terminated.

Ms. Crawford testified that the resource parent provides care, comfort, and support for the Child. She also ensures that the Child sees the doctor when he is sick and gets whatever he needs. She makes certain that the Child is clothed, fed, and attends daycare. The resource parent monitors the Child to ensure that he is developmentally on target. Ms. Crawford testified that she believes it is in the Child's best interest for the parental rights of Mother and Father to be terminated and for the Child to be free for adoption.

Mother testified that she is living in an apartment with another person and is employed. She claimed that her [f]ather is her support system but then described being abused by her [f]ather and stating that their relationship is better when they are distant. She testified that she "would do anything to get [her] son back" and stated that the CUA staff who testified lied in some of

- 5 -

their testimony about statements they attributed to her. The court was not persuaded by Mother's testimony.

Trial Court Opinion, 1/26/2024, at 18-24 (record citations omitted).

At the conclusion of the hearing, the trial court entered an order changing Child's goal from reunification to adoption and decrees terminating the parental rights of Mother and Father. Mother filed a timely notice of appeal from the decree; Mother and the trial court complied with Pa.R.A.P. 1925.

On appeal, Mother raises five separate issues, each of which challenges the trial court's decision as it relates to a different subsection of the termination statute. *See* Mother's Brief at 7 (raising claims concerning the sufficiency of the evidence to support terminating her parental rights to Child under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b)).

When reviewing a challenge to a decree terminating parental rights, we are mindful of the following:

> Termination of parental rights is among the most powerful legal remedies that the judicial system possesses. The decision to sever permanently a parent's relationship with a child is often bound up in complex factual scenarios involving difficult family dynamics and multiple service providers. Our trial courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act.

> Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts

must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

*Interest of S.K.L.R.*, 256 A.3d 1108, 1129 (Pa. 2021). Our Supreme Court has often "emphasized our deference to trial courts," but has also acknowledged that "we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021) (citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *Id.* at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019). If the trial court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in

issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (quotation marks and citations omitted).

As stated hereinabove, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8). "This Court may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)." ***In re J.F.M.***, 71 A.3d 989, 992 (Pa. Super. 2013). We focus our analysis on section 2511(a)(2).

Mother argues that DHS failed to provide sufficient evidence that she is currently unable to care for Child and that "past incapacity alone is not [a] sufficient basis for involuntary termination[.]" Mother's Brief at 17 (citing ***In re Adoption of A.N.D.***, 520 A.2d 31 (Pa. Super. 1986)). According to Mother, she has completed nearly all that has been required of her by DHS and the trial court; she is employed and receiving social security benefits that will allow her to financially care for Child; she has housing with a friend; and "with the appropriate support, can provide a safe home for herself and her child." ***Id.***

The trial court found that although Mother was willing to care for Child, she was simply unable based upon her mental health and intellectual disability. Trial Court Opinion, 1/26/2024, at 24.

> This court does not take the fact that Mother suffers from a form of mental disability lightly, when assessing whether or not her parental rights should be terminated. Frequently, termination of parental rights is a result of conscious decisions made by a parent.

> In this case, Mother seems to genuinely care about her [son] but is unable, and possibly unwilling, to care for [him] due to her own involuntary mental disability. It is well[]settled that a parent, whether disabled or not, must be able to meet the irreducible minimum parental requirements for a child who is in care. If a parent cannot, or will not, meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent. It is not required that a person, such as Mother, be offered a plan that she can meet if such a plan would then be insufficient to address her irreducible minimum parental responsibilities.

*Id.* (citation omitted).

Section 2511(a)(2) provides as grounds for termination of a parent's rights:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). As this Court has explained, termination of a parent's rights pursuant to section 2511(a)(2) requires that the petitioner show, by clear and convincing evidence, that the parent is presently unable to care for the child and will not be able to care for him for the foreseeable future. *Int. of A.R.*, 311 A.3d 1105, 1112 (Pa. Super. 2023) (internal citations omitted), *appeal denied*, ___ A.3d ___ 2024 WL 1650723 (Pa. Apr. 17, 2024). "This two-pronged test applies in the case of intellectually challenged parents as well as abusive or neglectful parents." *Id.* (internal citations omitted).

> A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in

the hope that the parent will summon the ability to handle the responsibilities of parenting. When a parent has demonstrated a continued inability to conduct her life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.* at *1111.

The record reflects that Child was originally removed from Mother's care immediately after his birth—over three years ago—based upon concerns about, inter alia, her mental health and ability to care for Child. DHS Exhibit 10 (Dr. Johnson's Expert Report), at 2. During visits with Child, Mother has exhibited an inability to control his behaviors or to maintain his safety. *See* N.T., 11/27/2023, at 19 (Ms. Brown testifying that Mother "has difficulty keeping him inside the room or preventing him from climbing on things," and requires continued direction by the visitation supervisor when, for example, Child is standing on a table), 28 (Ms. Brown testifying that Mother was not permitted to go outside with Child because "she lets him run freely," and there is concern that she would allow him to run into the street), 39 (describing a visit when Child was running through the halls, playing with light switches and knocking things over, and Mother responded by telling Child that he was "bad" without trying to redirect or stop him).

She also has been inattentive during visits with Child. For example, during the one supervised outing Mother attended with Child—a visit to Sesame Place—Mother refused to push Child's stroller, having visitation staff

- 10 -

do that instead, and left Child with staff so that she could go on a ride that Child did not want to do. *Id.* at 28-29. She reportedly regularly speaks to staff about frustrations in her life instead of visiting with Child and has to be reminded and redirected to pay attention to Child. *Id.* at 20-21. She also has repeatedly asked to be reminded of Child's name. *Id.* at 20. In fact, as the trial court noted, she misstated Child's name when she entered the underlying hearing. *Id.* at 30.

Significantly, during visits, Mother reportedly gets frustrated with Child's behaviors, which Ms. Brown described as typical toddler behavior, and despite Ms. Brown coaching her on different ways to approach Child, Mother does not listen or respond. *Id.* at 22. Ms. Brown testified that Mother told her that she cannot handle Child at this age because he does not listen well enough, and that she would be better equipped to parent him when he is five because his behavior would improve by then. *Id.*

Mother has never been able to progress beyond one-hour supervised visits during the three years Child has been in care. *Id.* at 13. Over the ten months that Ms. Brown was assigned to supervise visits, she testified that she saw no progress by Mother in terms of her being able to implement parenting skills. *Id.* at 41.

Dr. Johnson testified that she evaluated Mother's parenting capacity. *Id.* at 51. She found that the issues that brought Child into care have multiplied and that these problems have not been remedied by the

interventions that DHS has provided. *Id.* at 65. It was Dr. Johnson's opinion that Mother's compliance with her permanency plan did not remedy the concerns about her parenting, as "she continues to exhibit behaviors that suggest her ability to [e]ffectively parent her son independently remain limited." *Id.* In particular, problems surrounding her employment, romantic relationships, violence, and ability to parent remain, "all of which are significantly influenced by her mental health." *Id.* According to Dr. Johnson, the provision of services has not and will not remedy these concerns. *Id.* at 65-66. To the contrary, Dr. Johnson was of the opinion that Mother is unable to independently parent Child. *Id.* at 66. In her report, which DHS admitted into evidence without objection, Dr. Johnson states:

> [Mother] continues to demonstrate a gross lack of appreciation for the initial behaviors that resulted in DHS involvement. She does not appear to have made gains from services rendered thus far as evidenced by her inability to, or limited recall of, information shared in parenting education, domestic violence, or individual therapy. In addition, [Mother] has continued to exhibit violent and aggressive behaviors that place herself and others at risk, maintained that it is a viable response, and stated that aggression remained the primary coping response to feelings of anger.

DHS Exhibit 10, at 11. It was Dr. Johnson's opinion that Mother's history of trauma, mental health diagnoses, and cognitive limitations will make it unlikely that she will be willing or able to reflect on her behaviors or retain and internalize the information she is taught through the myriad services and interventions she has been provided. *Id.*

Based on the foregoing, our standard of review, and the trial court's credibility determinations, the evidence of record shows that Mother is not able to presently parent Child and will be unable to do so for the foreseeable future. *See A.R.*, 2023 WL 8226326, at *6. We therefore find no abuse of discretion in the trial court's finding that DHS presented clear and convincing evidence in support of termination pursuant to section 2511(a)(2).

Turning to section 2511(b), Mother argues that DHS failed to satisfy its burden of proving that termination best served Child's needs and welfare. Tacitly conceding that Mother and Child do not share a bond, she asserts that this is the fault of either DHS or the trial court because Mother was not provided with "therapeutic visits" or parent/child therapy. Mother's Brief at 20.

The trial court found that Child was bonded with his foster mother and additionally credited and gave "great weight" to the testimony presented by Ms. Brown, Dr. Johnson, and Ms. Crawford. Trial Court Opinion, 1/26/2024, at 24. Although the court believed that Mother genuinely loved Child, it was not persuaded by her testimony and further found that it did not warrant maintaining the parent-child relationship. *Id.*

Section 2511(b) provides:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect

- 13 -

to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Under section 2511(b), we focus on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *In re T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted). But it is not enough that there exists a bond between parent and child to avoid termination. Rather, the trial court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In re K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). Focusing upon the "child's development, and mental and emotional health," the trial court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1110-11.

Thus, a court must examine the matter from the child's perspective, placing his "developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* at 1105. Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied

- 14 -

mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." ***T.S.M.***, 71 A.3d at 268-69. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. ***K.T.***, 296 A.3d at 1105.

When determining whether the petitioner met its burden to prove that termination serves a child's needs and welfare, the trial court must consider, at a minimum, the factors delineated by our Supreme Court in ***K.T.***, all of which are of "'primary' importance in the [s]ection 2511(b) analysis" and "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare." ***Id.*** at 1109. In addition to the child's bond with his biological parent, the section 2511(b) analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***Id.*** at 1113 (citations omitted). Importantly, "trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." ***Id.***

Our review of the record supports the trial court's findings and its determination that DHS presented clear and convincing evidence that

- 15 -

termination of Mother's parental rights best served Child's needs and welfare. The record reflects that Child, who at the time of the termination was over three years old, has been in care since his birth, living in the same foster home. N.T., 11/27/2023, at 79-80. Child is bonded to his foster parent, who is also an adoptive resource for Child. *Id.* at 79, 82. The foster parent meets Child's needs, including ensuring that he receives services to address his development, behavior, motor skills, and speech, for all of which he has deficiencies. *Id.* at 80, 81. She also has enrolled him in daycare. *Id.* at 104.

Further, while Mother regularly visits Child, as the foregoing recitation of the evidence reflects, she is not capable of parenting Child or meeting his needs. Although Mother now contends that she should have been provided with more therapeutic interventions to assist her in parenting Child, the record before us is devoid of any evidence that she raised such a claim before the trial court or in her Pa.R.A.P. 1925(b) statement. This claim is therefore waived. *See* Pa.R.A.P. 302(a), 1925(b)(4)(vii). Even if not waived, it is meritless, as the evidence of record that the trial court found to be credible shows that no amount of interventions will allow Mother to internalize the lessons such that she could safely and independently parent Child. N.T., 11/27/2023, at 66; DHS Exhibit 10, at 11.

DHS provided evidence, in the form of testimony by Ms. Crawford, that terminating Mother's parental rights to Child would not irreparably harm him, and nothing in the record refutes that evidence. *See* N.T., 11/27/2023, at

104. To the contrary, the record clearly reflects, based on the trial court's credibility determinations, that the length of time Child has been in care, his need for permanency, his foster mother's continued and unwavering dedication to addressing his physical, emotional, mental, educational and physical needs, and despite her best efforts, Mother's inability to parent Child, all support a finding that Child's needs and welfare are best met by terminating Mother's parental rights and freeing Child for adoption. We therefore find no error in the trial court's decision.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/17/2024